# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ILA PRSSA PENSION FUND,

    **Plaintiff**,

             **v.**

ILA LOCAL 1740, ALF-CIO,

    **Defendant.**

**Civil No.** 18-1598 (FAB)

## OPINION AND ORDER

BESOSA, District Judge.

Plaintiffs Mark Blankenship, Dale MacGillivray, Francisco González-Rios, and Ángel Febres-Améstica, in their capacity as the Board of Trustees for the ILA PRSSA Pension Fund (hereinafter, "Board of Trustees") commenced a civil action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*., as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381 *et seq*. (Docket No. 1.) Defendant ILA Local 1740, AFL-CIO ("Local 1740") moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). (Docket No. 43 at p. 32.) For the reasons set forth below, Local 1740's motion for summary judgment is **DENIED**.

## I.   **Introduction**

ILA Local 1575 ("Local 1575") and Local 1740 are labor unions. (Docket No. 1 at p. 2.)  Both organizations are affiliated with the International Longshoremen's Association, AFL-CIO ("ILA"). Id.  The Board of Trustees administers the ILA PRSSA Pension Fund ("Pension Fund") for Local 1575, a multiemployer employee benefit plan pursuant to ERISA.  (Docket No. 38 at p. 2.)[1]

This litigation stems from the closure of Horizon Lines, "a major stevedoring company" in the Port of San Juan.  Unión de Empleados de Muelles de Puerto Rico, Inc. v. Int'l, Longshoremen's Ass'n, AFL-CIO, 884 F.3d 48, 53 (1st Cir. 2018).  Before terminating operations in Puerto Rico, Horizon Lines employed union members from Local 1575 pursuant to a collective bargaining agreement ("CBA").  (Docket No. 50, Ex. 1.)[2] Local 1575 served as the exclusive "representative of [Horizon Lines] employees . . . in all the ports on the Island of Puerto Rico engaged in the

---

[1] A multiemployer plan is "one to which multiple employers contribute, usually under collective bargaining agreements . . . Under such a plan, employers' contributions are pooled in a general fund and can be used to satisfy any of the plan's obligations."  Bd. of Trs. v. C&S Wholesale Grocers, Inc., 802 F.3d 534, 535 n.2 (3rd Cir. 2015) (citation omitted).

[2] Pursuant to Article XXIII of the CBA, after 2010 the agreement "will continue in force from year-to-year thereafter unless, either party gives written notice . . . of its desire to negotiate [a new CBA]." (Docket No. 50, Ex. 1 at p. 45.) In 2014, the parties extended the CBA until September 30, 2015. (Docket No. 50, Ex. 2 at p. 2.)  Horizon Lines closed, however, in March 2015.  Unión de Empleados de Muelles de Puerto Rico, Inc., 884 F.3d at 65.

handling of cargo." Id. at p. 6.[3]  Horizon Lines contributed to

the Pension Fund on behalf of Local 1575 members according to hours

of employment.   Id. at p. 40—46 ("[Horizon Lines] agrees to

contribute to the Welfare Fund, Life Insurance Fund, and Pension

Plan.").

    **A.**    **The Agreement and Declaration of Trust**

The Agreement and Declaration of Trust ("Trust

Agreement") predates the CBA, establishing the Pension Fund,

setting forth the fiduciary duties of the Board of Trustees and

other pertinent provisions. (Docket No. 52, Ex. 1.)  The Pension

Fund is an irrevocable trust, formed by the ILA and Local 1575 to

"receive and invest periodic contributions from Contributing

Companies" for "pension, retirement or related benefits" to union

employees.  Id. at pp. 5 and 13. Pursuant to the Trust Agreement,

a "contributing" company is:

> any corporation, company, partnership, government agency
> or individual with whom the Union now has or shall have
> a collective bargaining agreement or a supplement
> thereto with the Union requiring such company's
> participation in the periodic contributions to the ILA-
> PRSSA Pension Fund.

---

[3] Four local unions operated in the port of San Juan: (1) Local 1901 ILA, AFL-
CIO, (2) Local 1902 ILA, AFL-CIO, (3) Local 1740, and (4) Local 1575
("hereinafter "San Juan unions"). (Docket No. 38. at p. 9.)  Each union "had
their [sic] own members, collective bargains [sic] agreements and offered
different benefits to their respective members." Id.

(Docket No. 52, Ex. 1 at p. 7.)  A "contribution" is the "payment[]
required to be made to the Fund by Contributing Companies."  Id.
at p. 10.

     Local 1575 employed union officers and other personnel.
See Roger Hartley, The Framework of Democracy in Union Government,
32 CATH. U.L. REV. 13, 83 (1982) (noting that local unions "are
governed   by   elected   officials,   usually   a   president,   vice
president, secretary-treasurer and an executive board," generally
earning salaries "equivalent to the members' earnings").   For
instance, in 2014 the following individuals received salaries from
Local 1575:  (1) president Efraín Robles ("Robles") ($60,943.00),
(2)   former   president   Francisco   Díaz   ($74,790.00);   (3)   vice
president Francisco González ("González") ($13,276), (4) treasurer
Ángel López-Negrón ("López") ($1,300.00), and (5) secretary Mayra
Rivera ($40,095.00).   (Docket No. 54, Ex. 11 at pp. 15—16.)[4]
Horizon Lines granted "unlimited leaves of absence, without pay,
to employees who work in salaried positions with [Local 1575]."
(Docket No. 50, Ex. 1 at p. 34.)  Although Local 1575 is a "union,"
it also qualifies as a "Contributing Company" pursuant to the Trust
Agreement "solely and exclusively for the purpose of permitting
[it], if it so elects, to contribute to the Trust on behalf of

---

[4] González served as the Local 1575 vice-president and president in 2014 and
2015, respectively.  (Docket No. 41 at p. 1.)  As a member of the Board of
Trustees, he is also a plaintiff in this action.  Id.

[its] Employees and to permit [union] Employees to become Participants of the Fund." Id. By contributing to the Pension Fund, Local 1575 agreed to "cover each of its own employees . . . on the same basis as are made by the Contributing Companies." Id. at p. 12.

The Board of Trustees terminated the Pension Fund after Horizon Lines ceased operations in Puerto Rico. (Docket No. 38 at p. 5.)[5] On March 4, 2015, the Board of Trustees informed Local 1575 that:

---

[5] The termination of a multiemployer plan imposes fiduciary obligations on the Board of Trustees. 29 U.S.C. § 1341a(1)(2). For at least 50 years before Horizon Lines withdrew from the Pension Fund, Local 1575 entered into CBAs with various stevedoring companies. See Rotolo on behalf of NLRB v. United Marine Div., 225 F. Supp. 347, (D.P.R. 1964) ("Respondent Local 1575 has a collective bargaining agreement with Sea-Land covering the stevedores and warehouse workers employed at Sea-Land's dock terminal facilities located at Puerto Nuevo, Puerto Rico.") (Julián, J.); P.R. Marine Mgmt., Inc. v. Int'l Longshoremen's Ass'n., 398 F. Supp. 118, 123 (D.P.R. 1975) ("[Puerto Rico Marine Management] entered into a collective bargaining contract with [Local 1575], covering a unit composed of the employees engaged in the handling, loading and unloading of its vessels in all the parts of Puerto Rico.") (Torruella, J.). Union members entrusted Local 1575 with collecting pension contributions from employers, and that the Board of Trustees would maintain and invest retirement funds. ERISA regulations require that the Board of Trustees notify the appropriate government authorities "within thirty days after the last employer withdrew from the plan or thirty days after the first day of the first plan year for which no employer contributions were required under the plan, whichever is earlier." 29 C.F.R. § 4041A.11(c)(2). Moreover, the concomitant "statutory provisions, regulations, and plan provisions [continue to apply] until a trustee is appointed under section 4042 of ERISA or until plan assets are distributed." 29 C.F.R. 4041A.21. The record is devoid of evidence confirming that the Board of Trustees notified complied with these regulations.

> [the union had] elected to become a participating or
> contributing Employer to the [Pension Fund] to provide
> benefits to the eligible Union officials and employees.
> . . . Once the cessation of Horizon is final, the Fund
> will commence the process to collect withdrawal
> liability from the contributing employers and
> participating entities as established by the Employee
> Income Retirement Security Act, as amended.

(Docket No. 57, Ex. 3 at p. 2.)  The Board of Trustees seeks to

collect $668,807.00 from Local 1740 as the purported successor of

Local 1575 pursuant to ERISA and the MPPAA.  (Docket No. 1 at

pp. 9—10.)

**B.    The Merger Agreement**

Horizon Lines sold its assets to a competitor, Luis

Ayala-Colón" ("Ayala").  <u>Unión de Empleados de Muelles de Puerto</u>

<u>Rico, Inc.</u>, 884 F.3d at 53; Docket No. 1 at p. 4.  Local 1740 and

Local 1902 "had existing CBAs with Ayala and believed that they,

not Local 1575, were entitled to work for Ayala in Horizon Line's

former terminals."  <u>Id.</u> at 53.  Article 28 of the CBA between

Horizon Lines and Local 1575 provides, however, that the "Agreement

shall be binding upon the parties hereto, their successors,

administrators, executors and assigns."  (Docket No 51, Ex. 1 at

p. 43.)  Consequently, Local 1575 argued that the CBA with Horizon

Lines applied to Ayala.  <u>Unión de Empleados de Muelles de Puerto</u>

<u>Rico, Inc.</u>, 884 F.3d at 53.

On March 30, 2015, the San Juan unions entered into a Work Sharing Agreement to "resolve any disputes among the different unions." (Docket No. 43, Ex. 4.) Competition among the unions persisted, however, prompting the ILA to intervene. (Docket No. 43, Ex. 1 at p. 1.)[6] The ILA recommended that the San Juan unions merge. Id. According to the ILA, unified finances and membership "would be stronger than four, separate, smaller memberships and treasuries." Id.

The San Juan unions entered into a Merger Agreement on July 13, 2015, four months after Local 1575 received notice that the Board of Trustees intended to collect withdrawal liability from contributing employers. (Docket No. 43, Ex. 8; Docket No. 57, Ex. 3 at p. 2.) The Merger Agreement required Local 1575, Local 1901 and Local 1902 to "merge into and become an integral part of Local 1740." Id. at p. 2. Local 1740 "assumed[ed] all obligations" of Local 1575. Id. at p. 3. Local 1575 represented that it:

> **had no contractual or contingent liabilities except as reported to the U.S. Department of Labor on the 2014 LM reports**, no material change has been made to the financial conditions of either of the local unions, **and they have incurred no liabilities** and have made no expenditures without the consent of Local 1740, except

---

[6] Article 12 of the International Longshoremen's Association, AFL-CIO Constitution states that "Executive Officers shall have authority to merge or consolidate two or more locals on such terms and conditions as it deems necessary or appropriate when such action is deemed to be in the best interest of the International and its members." (Docket No. 40, Ex. 1 at p. 32.)

for necessary, routine, ordinary business expenses in connection with their functions.

Id. (emphasis added).[7]  Local 1575 president Efraín Robles signed and submitted the 2014 LM-2 form four months before the Merger Agreement.  (Docket No. 57, Ex. 12.)  Questions 16 and 17 asked whether union assets were "pledged as security or encumbered in any way," and whether Local 1575 had "any contingent liabilities at the end of the reporting period."  Id. at p. 3.  Local 1575 answered "No" to both questions.  Id.

The Merger Agreement required Local 1575 to assign all assets "including but not limited to accounts receivable and union monetary obligations due from members" to Local 1740.  (Docket No. 43, Ex. 8 at p. 3.)  López served as the Secretary-Treasurer for Local 1575.  (Docket No. 63, Ex. 1 at p. 1.)  López asserts that as of October 2015, Local 1575 possessed the following property:  $8,000,000.00 in accounts receivable regarding a real estate transaction, funds in accounts held at Banco Popular, artwork worth thousands of dollars, a vehicle, computers, equipment and supplies.  Id. at p. 3.  Local 1575 president

---

[7] The Labor-Management Reporting and Disclosure Act requires labor unions to file annual financial reports, known as LM-2 forms.  United States v. Browne, 505 F.3d 1229, 1246 n.9 (11th Cir. 2007) (citing 29 U.S.C. § 431).  Labor unions must disclose the "salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor union." 29 U.S.C. § 431(b)(3).  The Board of Trustees provided Local 1575's LM-2 forms from 2006 through 2014.  (Docket No. 57, Exs. 4—12.)

Francisco González purportedly instructed López to "worry [about the transfer to Local 1740] later." <u>Id.</u> at p. 2. According to López, "Local 1575 neither transferred its assets nor its financial records to Local 1740." <u>Id.</u> González alleges, however, that Local 1575 has "no records, assets, financial accounts, or charter." (Docket No. 41 at p. 3.)

The Board of Trustees asserts two causes of action. (Docket No. 1 at pp. 7—10.)[8] First, the Board of Trustees alleges that Local 1575 failed to contribute $7,040.00 to the Pension Fund in violation of ERISA, 29 U.S.C. § 1145 ("ERISA cause of action"). <u>Id.</u> at p. 9. Second, the Board of Trustees purports that Local 1575 accrued $661,767.00 in withdrawal liability pursuant to the MPPAA, 29 U.S.C. § 1381 ("MPPAA cause of action"). (Docket No. 1 at pp. 8—9.) Essentially, the Board of Trustees contends that Local 1740 is liable for Local 1575's Pension Fund obligations. (Docket No. 1 at p. 2.)

Local 1740 moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket No. 43 at p. 32.) The motion to dismiss sets forth two arguments: that

---

[8] Pursuant to ERISA, "district courts of the United States shall have exclusive jurisdiction of an action under this section without regard to the amount in controversy, except that State courts of competent jurisdiction shall have concurrent jurisdiction over an action brought by a plan fiduciary to collect withdrawal liability." 29 U.S.C. § 1451. Accordingly, the Court is satisfied that subject-matter jurisdiction exists in this case.

(1) "Local 1575 never actually merged with any other San Juan Local" and that (2) Local 1740 "does not comply with the applicable legal requirements to be considered an employer under ERISA." (Docket No. 43 at pp. 1-2.) The Court ordered the Board of Trustees to submit documents pertaining to Local 1575 and the Pension Fund. (Docket Nos. 46, 47 and 56.) Because the Court considered "documents outside the pleadings," Local 1740's motion to dismiss is converted to a summary judgment motion pursuant to Federal Rule of Civil Procedure 56. See Fed. R. Civ. P. 12(d); Collier v. City of Chicopee, 158 F.3d 601, 602 (1st Cir. 1998) (affirming conversion of a Rule 12(b)(6) motion "into a motion for summary judgment" because the parties "appended several affidavits"); Rocket Learning, Inc. v. Rivera-Sánchez, 851 F. Supp. 2d 384, 391 (D.P.R. 2012) (noting that "if [collateral evidence] is to be

relied on in deciding a motion to dismiss, the court must convert

such motions into ones for summary judgment") (Besosa, J.).[9]

        The motion for summary judgment presents three

sequential inquiries: (1) whether Local 1575 is an "employer"

pursuant to ERISA and the MPPAA, (2) whether Local 1575 and Local

1740 merged, and (3) what liabilities, if any, transferred to Local

1740. (Docket Nos. 1 and 43.)

        ERISA and the MPPAA apply exclusively to employers.

29 U.S.C. §§ 1145 and 1382; see Nat'l Integrated Grp. Pension Plan

v. Dunhill Food Equip. Corp., 938 F. Supp. 2d 361, 369 (E.D.N.Y.

2013) (holding that "the issue of whether an entity is an employer

within the meaning of the MPPAA is a threshold legal issue

requiring judicial resolution") (internal citation and quotation

omitted). As a condition precedent to the ERISA and MPPAA causes

---

[9] Before converting a motion to dismiss to a summary judgment motion, "all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The Court need not, however, "give express notice if the surrounding circumstances effectively place the parties on notice that the court has the option of treating the motion as a motion for summary judgment and the parities have been given reasonable" notice. C.B. Trucking v. Waste Mgmt., 137 F.3d 41, 44 (1st Cir. 1998) (holding that the solicitation of affidavits placed the parties on notice that the "district court intended to treat the motion [to dismiss] as a motion for summary judgment"); Ortega-Candelaria v. Johnson & Johnson, Case No. 08-2382, 2009 U.S. Dist. LEXIS 53991 *2 (D.P.R. 2009) ("The parties annexed [additional documents] to their briefs . . . and are, thus, aware that we must consider matters outside the pleadings to resolve the motion to dismiss. We, therefore, convert this motion to one for summary judgment.") (Fusté, J.). Both parties filed and relied on extraneous documents with leave from the Court. (Docket Nos. 40 and 43.) Accordingly, the Board of Trustees and Local 1740 received sufficient notice of the Court's intent to convert the motion to dismiss to a motion for summary judgment.

of action, the Board of Trustees must first establish that Local 1575 is an "employer" within the context of the relevant statutes.

## II. **Summary Judgment Standard**

A court will grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation." Dunn v. Trs. of Bos. Univ., 761 F.3d 63, 68 (1st Cir. 2014) (internal citation omitted).

The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Tobin v. Fed. Exp. Corp., 775 F.3d 448, 450 (1st Cir. 2014) (internal citation omitted). The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). The movant must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any'" which support its motion.  <u>Celotex</u>, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).

Once a properly supported motion has been presented, the burden shifts to the nonmovant "to demonstrate that a trier of fact reasonably could find in [its] favor."  <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted).  "When the nonmovant bears the burden of proof on a particular issue, [he or] she [or it] can thwart summary judgment only by identifying competent evidence in the record sufficient to create a jury question."  <u>Tobin</u>, 775 F.3d at 450-51.  A court draws all reasonable inferences from the record in the light most favorable to the nonmovant, but disregards unsupported and conclusory allegations.  <u>McGrath v. Tavares</u>, 757 F.3d 20, 25 (1st Cir. 2014).

## III. The ERISA Cause of Action

Congress enacted the Employee Retirement Income Security Act of 1974 as a remedial statute, cognizant that "many employees with long years of employment [had lost] anticipated retirement benefits owing to the lack of vesting provisions in such plans." 29 U.S.C. § 1001(a); <u>see</u> <u>Nachman Corp. v. Pension Benefit Guar. Corp.</u>, 446 U.S. 359, 374 n.22 (1980) ("A classic case, of course, is the shutdown of Studebaker operations in South Bend, Ind., in 1963, with the result that 4,500 workers lost 85 percent of

their vested benefits because the plan had insufficient assets to pay its liabilities.") (quotation omitted).  President Gerald Ford referred to ERISA as "that massive bill," providing more "rights and success in the area of labor-management than almost anything in the history of this country."  Michael Kelly, <u>Multiemployer Pension Plan Withdrawal Liability Limitations Without Limits</u>, 42 CASE W. RES. 255, 258 (1992) (citation omitted).

Subject to enumerated exceptions not relevant to this action, ERISA governs "any employee benefit plan" established by a labor union "representing employees engaged in commerce or in any industry or activity affecting commerce."  29 U.S.C. § 1003(a).[10] The Pension Fund constitutes an "employee benefit plan."  19 U.S.C. § 1002(3); <u>see</u> <u>Bath Marine Draftsman's Ass'n v. NLRB</u>, 475 F.3d 14, 18 (1st Cir. 2007) (holding that the Bath Iron Workers Pension Fund for Hourly Employers "is governed by the Employee Retirement Income Security Act of 1974").  Local 1575 "is a union with members in Puerto Rico which affects interstate commerce in the United States of America."  <u>Int'l Longshoremens' Ass'n AFL-CIO, Local</u>

---

[10] The exceptions that fall beyond the scope of ERISA are: (1) governmental plans, (2) church plans, (3) plans "maintained solely for the purpose of complying with applicable workmen's compensation or unemployment compensation or disability insurance," (4) plans maintained outside the United States for nonresident aliens, and (5) excess benefits plans that are unfunded.  29 U.S.C. § 1003(b).

1575 v. Horizon Lines of P.R., 554 F. Supp. 2d 125, 126 (D.P.R.

2007) (Besosa, J.).[11]  Accordingly, ERISA is applicable.

The ERISA cause of action is premised on section 1145, the

delinquent contributions provision. (Docket No. 1 at p. 8).

Pursuant to section 1145:

> Every employer who is obligated to make contributions to
> a multiemployer plan under the terms of the plan or under
> the terms of a collectively bargained agreement shall,
> to the extent not inconsistent with law, make such
> contributions in accordance with the terms and
> conditions of such plan or such agreement.

29 U.S.C. § 1145; see Mass. Laborers' Health & Welfare Fund v.

Starrett Paving Corp., 845 F.2d 23 (1st Cir. 1988) ("Among other

things, ERISA imposes upon employers who promise to contribute to

an employee pension plan, a federal obligation to make those

contributions."). Congress intended to "give employers a strong

incentive to honor their contractual obligations to contribute and

to facilitate the collection of delinquent accounts." Laborers

Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,

484 U.S. 539, 547 (1988); Cent. Pa. Teamsters Pension Fund v.

McCormick Dray Line, Inc., 85 F.3d 1098, 1103 (3rd Cir. 1996)

(noting that "beneficiaries must be able to rely on the

---

[11] The Court takes judicial notice of the pleadings and judicial orders docketed in Horizon Lines of P.R., 554 F. Supp. 2d 125. See Rodríguez-Torres v. Gov't Dev. Bank of P.R., 750 F. Supp. 2d 407, 411 (D.P.R. 2010) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand") (internal citation omitted) (Besosa, J.).

contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations") (internal citation and quotation omitted).

The Board of Trustees must "establish two basic elements: (1) that [Local 1575] had a contractual obligation to contribute to a multiemployer plan; and (2) that [Local 1575] failed to make those contributions." Bldg. Serv. 32BJ Health Fund v. Bus. Res. & Sec. Servs., USA, Case No. 16-3128, 2018 U.S. Dist. LEXIS 82867 *4 (S.D.N.Y. May 14, 2008) (citing Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo, 35 F.3d 29, 36 (2d Cir. 1994) ("[Section] 1145 permits recovery only against those employers who are already obligated, in the absence of ERISA, to make ERISA contributions.")).  The Board of Trustees, as plan sponsor, has standing to commence an action pursuant to section 1145. Laborers Health & Welfare Trust Fund, 484 U.S. at 547 ("The liability created by [section 1145] may be enforced by the trustees of a plan by bringing an action in federal district court pursuant to [section 1132].")

A.   **Local 1575 is An Employer Pursuant to ERISA**

Title I of ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a

group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5). Immediately preceding the "employer" definition, ERISA provides that an "employee organization" is a labor union. Id. § 1002(6). The complaint alleges that Local 1575 qualifies as both. The Court agrees.

The obligation to contribute is an essential element of a section 1145 claim. See, e.g., Rhinehart v. United Bhd. of Carpenters Pension Fund, 191 F. Supp. 2d 1283, 1288 (W.D. Okla. 2001) ("The Union is an employer covered by the Plan and made contributions to the Fund on behalf of its officers, including [the president]."); Deibler v. United Foods & Commercial Worker's Local Union 23, 973 F.2d 206 (3rd Cir. 1992) (applying ERISA to an employee benefit plan created by a union for its officers).

Failure to establish a contribution obligation negates the requisite "in relation to an employee benefit plan" component in the "employer" definition. Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 313 (2d Cir. 1990) ("Of course, the benefit plan must prove that the employer promised to contribute to the plan in order to succeed on [the section 1145] claim."); see, e.g., Cement Mason's Union Local No. 592 Pension Fund v. Zappone, 501 F. Supp. 2d 714, 723 (E.D. Pa. 2007) (granting summary judgment in a section 1145 action because the employer "is not under a contractual obligation to make contributions to the Local 592

Funds"). For instance, in <u>Teamsters Local 251, Health Servs. &</u> <u>Ins. Fund. v. Teamsters, Chauffeurs, etc. Local 251</u>, pension plan fiduciaries sued a labor union in its capacity as an employer pursuant to section 1145. 689 F. Supp. 48 (D.R.I. 1998). The pension fund and labor union "had been signatories to the Agreement and Declaration of Trust," setting forth a "benefit plan for certain officers" of the labor union. <u>Id.</u> at 48. Because the "Union was required to make periodic contributions to the Fund," section 1145 applied. <u>Id.</u> at 51 and 53 ("holding that the pension fund "is entitled to recover contributions that [the labor union] should have paid since July 1, 1978").

ERISA requires that pension plans "shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). This instrument must set forth, *inter alia* the fiduciaries, "a procedure for establishing and carrying out a funding policy," and "the basis on which payments are made to and from the plan." <u>Id.</u> § 1102(b). The Trust Agreement established by the ILA and Local 1575 is a written instrument, memorializing the terms of Pension Fund participation, execution, and interpretation. (Docket No. 53, Ex. 1 at p. 7.) Indeed, the Board of Trustees and Local 1575 anticipated that the union would contribute to the Pension Fund "on behalf of [its] employees."

Id.  According to Article II of the Trust Agreement, Local 1575

specified that:

> if it elects to become a Contributing Company, [it] will
> pay to the Fund to cover each of its own employees for
> pension benefits contributions on the same basis as are
> made by the Contributing Companies, and Local 1575 will
> make these payments no later than the 30th day following
> the expiration of each quarter.

Id. at p. 12.

        The Trust Agreement merely provides for the possibility

of union participation in the Pension Fund.  The Board of Trustees

is  "unable  locate  any  separate,  written  agreement  between

Local 1575 and the Pension Fund."  Docket No. 57 at p. 2.)  The

section 1145 cause of action may proceed, however, in the absence

of  a  written  agreement  between  the  Board  of  Trustees  and

Local 1575.   The  dispositive  inquiry  is  whether  Local  1575

manifested an intent to incur an obligation to contribute.  See

Moriarty v. Larry Funeral Dirs., 150 F.3d 773, 777 (7th Cir. 1998)

("[ERISA] and the general principles of contract law permit an

employer to adopt a collective bargaining agreement by the court

if conduct plus a writing such as the certification line on the

contribution report; a signature at the bottom on a [CBA] itself

is unnecessary."); Brown v. C. Volante Corp., 194 F.3d 351, 356

(2d Cir. 1999); Bricklayers Local 21 of Ill. Apprenticeship &

Training Program v. Banner Restoration, Inc., 385 F.3d 761, 768

(7th Cir. 2004) (holding that "the district court was entitled to conclude that [the company's] seven-year course of conduct manifested an intent to be bound to the terms of the CBA").[12]   The Court determines whether Local 1575 assumed an obligation to contribute pursuant to the totality of the circumstances. <u>Hein v. TechAmerica Grp.</u>, 17 F.3d 1278, 1280 (10th Cir. 1994) ("Where the plan does not comply with ERISA's writing, disclosure and distribution requirements, rights under the plan may be established by the totality of the evidence."); <u>Donovan v. Dillingham</u>, 688 F.2d 1367, 1373 (11th Cir. 1982) (holding that a pension plan "under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, and the source of financing, and procedures for receiving the benefits") (internal citation omitted).

The Board of Trustees submitted the following evidence to demonstrate an obligation to contribute:  (1) minutes from a Board of Trustees meeting, (2) a March 4, 2015 letter from the Pension Fund administrator to the Local 1575 president, (3) LM-2

---

[12] The Court relies on precedent concerning an employer's implicit adoption of a CBA, a document that generally sets forth the relevant ERISA obligations. Because Local 1575 is both a union and an employer, there is no CBA.  The union need not bargain with itself.  The CBAs cited by the Court nonetheless represent the obligation to contribute and are analogous to the purported agreement between Local 1575 and the Pension Fund.

reports from 2006 through 2014, (4) a February 28, 2006 letter from the Local 1575 president to the ILA, and (5) a 2006 check from Local 1575 to the Pension Fund. (Docket No. 57, Exs. 1—12; Docket No. 59, Exs. 1—3.)  This evidence illustrates that for a decade Local 1575 repeatedly acknowledged and contributed to the Pension Fund.

       **1.**   **The Board of Trustees Meeting Minutes:**  On June 28, 2006**,** the Board of Trustees held a meeting in San Juan, Puerto Rico.  (Docket No. 59, Ex. 2.)  The meeting minutes note that the "Local 1575 proposal contemplates pension coverage for [union] officers and employees . . . to cover them through payment of the contract hourly rate for 2,000 hours per year."  (Docket No. 59, Ex. 2 at p. 7.)  Subsequently, the Board of Trustees noted that Local 1575 "has also agreed in writing to contribute to the Pension Fund on behalf of its full-time employees the contract hourly rate for 1,600 hours per year."  Docket No. 57, Ex. 2 at p. 3; see Diebler, 973 F.2d at 210 (holding that the "minutes of the 1968 meeting in which Local 590 adopted the severance policy reflect an intent to establish a regular and ongoing severance plan for retiring union officers").

       **2.**   **The March 4, 2015 Letter:**  The Pension Fund wrote a letter to the former president of Local 1575, stating that in 2006 the union "elected to become a participating or contributing

Employer to the ILA-PRSSAA Pension Fund to provide benefits to
eligible Union officials and employees. Under the terms of such
agreement, [Local 1575] contributes the applicable rate on the
basis of 1,600 hours per year for the pension benefits, payable on
a quarterly basis." Docket No. 57 Ex. 3 at p. 2; see Williams v.
Wright, 927 F.2d 1540, 1548 (11th Cir. 1991) (remanding action
because "the district court erred in ruling that the 1981 letter
did not establish a 'plan' or 'program' within ERISA").

      **3.   The LM-2 Reports:**  The Board of Trustees submitted
annual LM-2 reports to the Department of Labor. See 29 U.S.C.
§ 341(b) ("Every labor organization shall file annually with the
Secretary a financial report signed by its president and
treasurer"). Local 1575 employed a president, vice president,
secretary, trustees, secretary-treasurer and employees engaged in
representational activities. (Docket No. 57, Exs. 4-12.)
From 2006 through 2014, Local 1575 contributed $225,680.00 to the
Pension Fund. Id.[13]

      **4.   The February 28, 2006 Letter:**  The former president
of Local 1575 mailed a letter to the Pension Fund administrator
and the president of the ILA regarding the union's "proposal to

---

[13] Local 1575 remitted the following contributions to the Pension Fund:
2006 ($31,520.00); 2007 ($19,680.00); 2008 ($26,240.00); 2009 ($24,080.00);
2010 ($20,640.00); 2011 ($30,240.00); 2012 ($20,160.00); 2013 ($26,560.00); and
2014 ($26,560.00). (Docket No. 57, Exs. 4-12.)

make contributions." (Docket No. 59, Ex. 1.) The letter enclosed

the "first Contribution Report," disclosing that the "total hours

worked for the first quarter were 2,856.40 based on the rate per

hour; the amount of contribution for the first quarter will be

. . . $11,139.96 for the ILA-PRSSA Pension fund." Id. at p. 2.

This letter is compelling evidence that Local 1575 intended to

assume a contribution obligation.

    **5.    Contribution Check:** On July 13, 2006, the president

of Local 1575 wrote a check for $18,720.00 to the Pension Fund.

(Docket No. 59, Ex. 3.) The check is for "pension benefits from

October 1, 2005 to June 30, 2006." Id.

        There is no genuine dispute that Local 1575

incurred an obligation to contribute, remitting thousands of

dollars to finance the retirement of its officers and employees.

See Frank v. Colt Indus., Inc., 910 F.2d 90, 97 (3rd Cir. 1990)

(Although ERISA requires "an employer who establishes an employee

benefit plan to do so in a relatively formal fashion . . . this

does not mean that when an employer maintains an informal plan in

violation of the statute, the policies underlying the statute

become inoperative"); Trs. of the Plumbers & Steamfitters Local

Union No. 43 Health & Welfare Fund v. Crawford, Case No. 06-245,

2007 U.S. Dist. LEXIS 92934 *23 (E.D. Tenn. Dec. 18, 2007)

("Unilateral actions by an employer that foster an impression that

the employer intends to be bound by an expired collected bargaining agreement are also sufficient to trigger ERISA liability."). The Trust Agreement established the Pension Fund, affording Local 1575 the discretion to become a "contributing company." (Docket No. 52, Ex. 1 at p. 7.) The evidence presented by the Board of Trustees establishes that Local 1575 affirmatively exercised this discretion. Consequently, the totality of the circumstances establish that Local 1575 incurred an obligation to contribute, assuming the role of both a labor organization and employer pursuant to ERISA. This conclusion comports with the "strong congressional desire to minimize contribution losses and the resulting burden such losses impose upon other plan participants." Flynn v Interior Finishes, Inc., 425 F. Supp. 2d 38, 44 (D.D.C. 2006) (internal citation and quotation omitted).

## IV. The Multiemployer Pension Plan Amendments Act of 1980

While the passage of ERISA provided comprehensive protection for pension beneficiaries, employers nonetheless withdrew from multi-employer pension plans "in increasing numbers, leaving plans without adequate funds to pay vested employee benefits." Giroux Bros. Transp. v. New England Teamsters & Trucking Indus. Pension Fund, 73 F.3d 1, 2—3 (1st Cir. 1996). In 1974, Congress established the Pension Benefit Guaranty Corporation ("PBGC") to confirm that employees receive "the benefits they were promised."

Pension Benefit Guar. Corp. v. Findlay Indus., Inc., 902 F.3d 597,
610 (6th Cir. 2018); see 29 U.S.C. § 1302.  Modeled after the
Federal Deposit Insurance Corporation, the PBGC assumes the
"assets and liabilities of terminated pension plans . . . to cover
what it can of the benefit obligations."  Pension Benefit Guar.
Corp. v. LTV Corp., 496 U.S. 633, 637 (1990); see 29 U.S.C. § 1332a
(The PBCG guarantees "the payment of all nonforfeitable benefits
. . . under a multiemployer plan").[14]

ERISA initially required "employers who had contributed to
the plan five years preceding its termination" to fund the vested,
unfunded benefits.  Pension Benefit Guar. Corp. v. R.A. Gray &
Co., 467 U.S. 717, 720 (1984).  This provision encouraged employers
to withdraw from "plans on the gamble that the plan would survive
for five years after their departure," requiring the remaining
employers and the PBGC to finance employee retirement benefits.
Crown Cork & Seal Co. v. Central States Southeast & Southwest Areas
Pension Fund, 982 F.2d 857, 861 (3rd Cir. 1992).[15]   The

---

[14] The PBGC is funded by "(1) insurance premiums set by Congress and paid by
sponsors of defined benefit plans, (2) investment income, (3) assets in
terminated plans, and (4) recoveries, if any, from employers whose underfunded
plans have terminated."  Pension Benefit Guar. Corp. v. Republic Techs. Int'l,
LLC, 386 F.3d 659, 661 (6th Cir. 2004); see 29 U.S.C. § 1305.

[15] A complete withdrawal occurs when an employer "permanently ceases to have an
obligation to contribute under the plan" or "permanently ceases all covered
operations under the plan."  29 U.S.C. § 1383.  A partial withdrawal by an
employer occurs when "there is a 70-percent contribution decline" or "there is
a partial cessation of the employer's contribution obligation."  29 U.S.C.
§ 1385(a).

Multiemployer Pension Plan Amendments Act of 1980 eliminated this escape mechanism by establishing "mandatory liability on all withdrawing employers" for the "difference between the present value of the fund's vested benefits and the value of its assets." Keith Fulton & Sons, Inc. v. New English Teamsters & Trucking Indus. Pension Fund, 762 F.2d 1124, 1126 (1st Cir. 1984); Bd. of Trs. v. Northern Steel Corp., 657 F. Supp. 2d 155, 158 (D.D.C. 2009) ("The withdrawal liability payment requirement generally protects the financial integrity of multiemployer plans, prevents withdrawing employers from shifting their burdens to remaining employers, and eliminates an incentive for employers to flee underfunded pension plans.") (internal citation and quotation omitted).

Once an employer withdraws from a multiemployer plan, the plan fiduciary determines "the amount of the employer's withdrawal liability." 29 U.S.C. §§ 1301(10) and 1382; Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking Indus. Pension Fund, Inc., 762 F.2d 1137, 1148 (1st Cir. 1985) ("As the court points out, the amount to be assessed against a withdrawing employer is determined in the first instance by the trustees of the Fund."). The MPPAA sets forth "several complex formulas for computing withdrawal liability." Wise v. Ruffin, 914 F.2d 570, 572 (4th Cir. 1990); ISB Liquidating Co. v. Dist. No. 15 Machinists' Pension Fund, 127

F. Supp. 2d 192, 194 (E.D.N.Y. 2001) ("To determine the amount of liability, the plan sponsor must use one of four methods provided for by statute or any alternative method approved by the [PBGC]."). The Board of Trustees contends that the withdrawal liability concerning the Local 1575 Pension Fund is $661,767.00. (Docket No. 1 at p. 9.)

### A.    Local 1575 is an Employer Pursuant to the MPPAA

The MPPAA is located in Title IV of ERISA. 29 U.S.C. §§ 1301—1461. In Nachman Corp., the Supreme Court held that the "definitions in [Title I] are not necessarily applicable to Title IV." 446 U.S. at 370. Whether Local 1575 is an employer for purposes of the MPPAA is a question of law. De Breceni v. Graf Bros. Leasing, Inc., 828 F.2d 877, 880 (1st Cir. 1987) (noting that defining the term "employer" within the MPPAA "is up to the courts," but declining to set forth a definition). The Court is

unaware of any decision published in the First Circuit that defines the term "employer" pursuant to the MPPAA.[16]

In Korea Shipping Corp. v. N.Y. Shipping Ass'n, the Second Circuit Court of Appeals set forth the following definition: an employer is "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." 880 F.2d 1531, 1537 (2d Cir. 1989). Pursuant to the MPPAA, an "obligation to contribute" is an obligation (1) "under one or more collective bargaining (or related) agreements," or (2) "as a result of a duty under applicable labor-management relations law, but does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions." 29 U.S.C. § 1392. The Fourth, Sixth, Seventh, Eighth, Ninth and Eleventh Circuit Courts of

---

[16] The First Circuit Court of Appeals has, however, addressed whether an entity qualifies as a MPPAA employer in discrete circumstances. See De Breceni, 828 F.3d at 878 (holding that general principles of corporate law govern "whether a corporate shareholder or officer may be help personally liable for the withdrawal lability"); Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund, 724 F.3d 129, 133 (1st Cir. 2013) (holding that a private equity fund was an MPPAA employer because it "sufficiently operated, managed, and was advantaged by its relationship with its portfolio company, the now bankrupt SBI"); Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp., 139 F.3d 304, 305 (1st Cir. 1998) (applying the alter ego doctrine to suits holding "one company liable for benefit plan contributions [that] another company has contracted to make under the Multiemployer Pension Plan Amendments Act of 1980").

Appeals have endorsed the definition set forth in <u>Korea Shipping</u>.[17]

Similar to the section 1145 analysis, an "entity can, under certain

circumstances, be bound by (and therefore be obligated to

contribute under) a CBA it did not sign" for purposes of the MPPAA.

<u>Div. 1181 A.T.U. - N.Y. Emps. Pension Fund v. City of N.Y. Dep't

of Educ.</u>, 910 F.3d 608, 615 (2d Cir. 2018).   The record is replete

with evidence establishing that Local 1575 employed its officers

as an MPPAA employer, assuming an obligation to contribute.   <u>See</u>

supra Part III(A).   Consequently, Local 1575 is subject to the

MPPAA in its capacity as an employer.

---

[17] <u>See</u> <u>Mary Helen Coal Corp. v. Hudson</u>, 235 F.3d 207, 212 (4th Cir. 2000) ("The
contributing obligor definition of employer, applicable to [the MPPAA], is
grounded in the underlying purpose of the statute."); <u>Central States, Southeast
& Southwest Areas Pension Fund v. Int'l Comfort Prods., LLC</u>, 585 F.3d 281 (6th
Cir. 2009) (adopting verbatim the definition of employer from <u>Korea Shipping</u>);
<u>Central States, Southeast & Southwest Areas Pension Fund v. Cent. Transp.</u>, 85
F.3d 1282, 1287 (7th Cir. 1996) ("Therefore, the appropriate inquiry is whether
the alleged employer had an obligation to contribute as well as the nature of
that obligation."); <u>Seaway Port Auth. v. Duluth-Superior ILA Marine Ass'n
Restated Pension Plan</u>, 920 F.2d 503, 507 (8th Cir. 1990) ("We believe the
purposes of policies underlying the MPPAA are best satisfied by the definition
in the Second Circuit proffered in <u>Korea Shipping</u>."); <u>Resilient Floor Covering
Pension Fund v. M&M Installation, Inc.</u>, 630 F.3d 848, 852 (9th Cir. 2010)
(applying the definition of employer as set forth in <u>Korea Shipping</u>); <u>Carriers
Container Council, Inc. v. mobile S.S. Ass'n, Inc.-Int'l Longshoremen's Ass'n</u>,
896 F.2d 1330, 1343 (11th Cir. 1990) ("We hold, therefore, that the contributing
obligor definition drawn from Title I applies to the term 'employer' in [the
MPPAA].").   District courts in the Third and Eleventh Circuits have followed
suit.   <u>See</u> <u>N.J. Carpenters Pension Fund v. Hous. Auth.</u>, 68 F. Supp. 3d 545, 561
(D.N.J. 2014) ("As stated above, it is well-established that an 'employer' under
the MPPAA includes any person or entity "obligated to contribute to a [pension]
plan either as a direct employer or in the interest of an employer of the plan's
participants.") (quoting <u>Korea Shipping</u>, 880 F.2d at 1537); <u>Ironworkers Local
No. 808 v. Sicilia</u>, 45 F. Supp. 2d 1332, 1334 (M.D. Fla. 1999) (applying the
definition of employer in <u>Korea Shipping</u>).

## V.   A Genuine Issue of Material Fact Exists Regarding the Local 1575 and Local 1740 Merger

The Board of Trustees and Local 1740 concur that the San Juan unions signed the Merger Agreement. (Docket No. 43, Ex. 8.) Local 1575 ostensibly assigned "all of the right, title, interest in and to all of [its] assets" to Local 1740. (Docket No. 43, Ex. 8 at p. 3.) Despite this written memorialization, Local 1740 argues that "there was no merger." (Docket No. 43 at p. 7.)

The International Longshoremens' Association appointed James Paylor ("Paylor") "to deal with the problems arising out of the closure of Horizon Lines." (Docket No. 43, Ex. 1 at p. 1.) Paylor asserts that "Local 1575 has never merged with the other locals, mainly because of resistance from its officers [by refusing] to turn over its assets to Local 1740." Id. at p. 6. Carlos Sánchez-Ortiz, the president of Local 1740, and former Local 1575 secretary-treasurer López corroborate Paylor's statement regarding the transfer of union assets. (Docket No. 43, Ex. 2 at p. 5; Docket No. 63, Ex. 1 at p. 2.) The Board of Trustees asserts, however, that:

> At no time before or after the signing of the Merger Agreement was Francisco González, the acting president of Local 1575, informed that the merger of Local 1575 into Local 1740 was contingent on obtaining the International's approval of the merger or Local 1575's surrender of its assets, financial accounts and charter.

(Docket No. 40 at p. 9.)  Because material issues of fact remain concerning the transfer of union assets and the Merger Agreement, summary judgment is not appropriate.  Local 1740 is potentially liable for the Pension Fund liabilities incurred by Local 1575 pursuant to the Merger Agreement.  Whether Local 1575 and Local 1750 in fact merged will determine the disposition of this litigation.

## IV.  Conclusion

For the reasons set forth above, Local 1740's motion for summary judgment is **DENIED**.  (Docket No. 43.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, November 27, 2019.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE