IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| BOARD OF TRUSTEES,<br><br>Plaintiff,<br><br>v.<br><br>ILA LOCAL 1740, AFL-CIO,<br><br>Defendant. | CIV. NO. 18-1598 (SCC) |

## OPINION AND ORDER

The Board of Trustees of the ILA PRSSA Pension Fund has filed suit against ILA Local 1740, seeking to collect delinquent contributions and withdrawal liability. Both parties have moved for summary judgment. Docket Nos. 122, 126. For the reasons below, the Court grants the Board's motion and denies Local 1740's motion.

### I.  BACKGROUND

The Board administers the Pension Fund. One of its duties is collecting delinquent contributions and withdrawal liability from employers that are obligated to contribute to the fund. Local 1575 is one of these employers. The Board claims that Local 1575 merged into Local 1740 and therefore Local

1740, as the surviving entity, is obligated to pay Local 1575's delinquent contributions and withdrawal liability. It asserts two claims against Local 1740: (1) a delinquent contribution claim under the Employment Retirement Income and Security Act (ERISA) of 1974, 29 U.S.C. § 1145, and (2) a withdrawal liability claim under the Multiemployer Pension Plan Amendments Act (MPPAA) of 1980, 29 U.S.C. § 1381. Earlier, Local 1740 filed a motion to dismiss these claims on the grounds that it is not an employer that is obligated to contribute to the fund and the merger never occurred. We converted it into a motion for summary judgment and denied it, concluding that Local 1575 is an employer under both ERISA and the MPPAA, there is a genuine dispute of material fact as to whether these locals merged, and whether they merged will resolve this lawsuit. Docket No. 69.

Now that discovery has concluded, both the Board and Local 1740 have moved for summary judgment. The Board moves for summary judgment on the ground that the merger between Locals 1575 and 1740 was effective, so Local 1740 has

assumed Local 1575's liability to the Pension Fund. Docket
No. 122. And even if the merger was ineffective, the Board
argues, Local 1740 is liable under the alter-ego doctrine. Local
1740 moves for summary judgment on the same grounds as
before: It is not an employer under ERISA or the MPPAA and
it never merged with Local 1575. Docket No. 126.

## II.  SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the
boilerplate of the pleadings and assay the parties' proof in
order to determine whether trial is actually required." *Tobin
v. Fed. Express Corp.*, 775 F.3d 448, 450 (1st Cir. 2014) (quoting
*Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.
1992)). The movant must first "demonstrate the absence of a
genuine issue of material fact." *Celotex Corp. v. Catrett*, 477
U.S. 317, 323 (1986). A fact is material if it might affect the
outcome of the lawsuit. *Zampierollo-Rheinfeldt v. Ingersoll-Rand
de P.R., Inc.*, 999 F.3d 37, 50 (1st Cir. 2021). And there is a
genuine dispute over it when "the evidence, viewed in the
light most flattering to the nonmovant, would permit a

rational factfinder to resolve the [fact] in favor of either party." *Id.* (quoting *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)). After the movant has met his initial burden, the burden shifts to the nonmovant to "produc[e] specific facts sufficient to deflect the swing of the summary judgment scythe." *Joseph v. Lincare, Inc.*, 989 F.3d 147, 157 (1st Cir. 2021). The nonmovant, in other words, must show that a "trialworthy issue exists." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). In the end, summary judgment is appropriate only when the record demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Alston v. Town of Brookline*, 997 F.3d 23, 35 (1st Cir. 2021).

We begin by laying out the undisputed material facts. Then we turn to whether either party has shown, based on these facts, that it is entitled to judgment as a matter of law. *Barnes v. Fleet Nat'l Bank*, 370 F.3d 164, 170 (1st Cir. 2004).

### III. UNDISPUTED FACTS[1]

The International Longshoremen's Association (ILA) is the largest labor union of maritime workers in North America. LUF 1; RLUF 1. There used to be several local labor unions, which were all ILA entities, at the Port of San Juan: Locals 1575, 1740, 1901, and 1902. LUF 3; RLUF 3; BUF 9; RBUF 9. In March 2015, a stevedoring company called Horizon Lines, LLC ("Horizon"), stopped operating at the port. BUF 12; RBUF 12. When Horizon left, Local 1575's members lost their jobs. BUF 13; RBUF 13; LUF 36; RLUF 36. ILA tried to find them jobs but there were not enough on ILA's piers. LUF 49–52; RLUF 49–52. Many of Local 1575's members retired, left Puerto Rico, or went to work at Crowley. LUF 45, 52; RLUF 45, 52.

---

1. The Court draws the undisputed facts from the Board's statement of undisputed material facts (BUF), Docket No. 123; Local 1740's response to them (RBUF), Docket No. 142; Local 1740's statement of undisputed material facts (LUF), Docket No. 127; and the Board's response to them (RLUF), Docket No. 144. But we do not draw any facts from the Board's additional undisputed facts, Docket No. 144, nor Local 1740's response to them, Docket No. 152, because these facts are largely redundant.

Later that year, another stevedoring company, Luis A. Ayala Colón Sucres, Inc. ("Ayala"), expanded its operations and took over piers E and F, which Horizon had occupied. BUF 14; RBUF 14. But only Locals 1740, 1901, and 1902 had work contracts with Ayala. BUF 15; RBUF 15. So according to them, only they could work in Ayala's new territory on those piers. BUF 15; RBUF 15. Local 1575, however, saw things differently. It believed that its contract with Horizon carried over to its successors and assigns, including Ayala, and thus it had the right to work for whatever entity occupies those piers. BUF 16; RBUF 16; Docket No. 128-16.[2] ILA appointed a

---

2. There are hundreds of proposed undisputed material facts. And many of them are hotly disputed. Under our local rules, a fact that is supported by a record citation is deemed admitted if it is not properly controverted. D.P.R. Civ. R. 56(e). A fact is properly controverted if its opponent "support[s] [the] denial or qualification by a record citation." D.P.R. Civ. R. 56(b). The Board supported this fact. Local 1740 denies it on the grounds that it is immaterial and it cannot admit or deny what Local 1575 believed. RBUF 16. But it does not support its denial with a record citation. So we deem the fact admitted. Moving forward, when we deem a fact admitted, we will cite the fact, the opponent's response, and the fact's record support. And when we exclude a fact, it is because it is immaterial, disputed, not supported by a record citation, or any combination of these.

committee to investigate and resolve this dispute. BUF 17; RBUF 17. In March 2015, ILA's executive counsel decided to resolve it by merging the locals. BUF 20; RBUF 20.

### A. ILA's Structure

ILA is the locals' highest governing body. BUF 5; RBUF 5. Its constitution states that it owns all money (*e.g.*, fees, dues, assessments) paid to the locals and all their assets but the locals may possess and control them. BUF 6; RBUF 6. And it also states that ILA has the power to merge local unions under any terms and conditions that its executive officers deem proper. LUF 125–26; RLUF 125–26. Each local has its own ILA charter, bylaws, officers, boards, members, collective-bargaining agreements, and benefits. LUF 9–10; RLUF 9–10. So, by and large, the locals run themselves. LUF 12; RLUF 12.

ILA can amend a local's charter if it chooses to merge it with another that has a different craft or job classification. LUF 114; RLUF 114. It amended Local 1740's charter in May 2015, before the locals signed the merger agreement. LUF 116; RLUF 116. When a merger ends a local's existence, that local

no longer has authority under its charter. LUF 157; RLUF 157.

## B. Work-Sharing Agreement & Merger Agreement

Before the locals signed the merger agreement, the ILA committee required the locals to enter into a work-sharing agreement, BUF 21; RBUF 21, which was intended to keep Local 1575's members employed, BUF 22; RBUF 22. Under the agreement, Local 1575's members retained their seniority and paid their dues to Locals 1740, 1901, and 1902. BUF 24; RBUF 24. But generally, seniority does not transfer when a person transfers from one local to another. BUF 100; RBUF 100. If members want to transfer, they call ILA for transfer cards, and if there is work available, the members transfer. LUF 99–100; RLUF 99–100. ILA encouraged Local 1575's members to transfer to the other locals. BUF 25; RBUF 25.

After the locals signed the work-sharing agreement, ILA sent them a letter saying that it "is fully committed" to merging them and that the ILA committee would "pursue this goal until the merger is fully realized and completed." BUF 27; RBUF 27. ILA believed that one large local with

unified finances and membership would be stronger than four smaller ones, BUF 28; RBUF 28, and that unity would allow them to better resolve issues, BUF 32; RBUF 32.

On April 1, 2015, James Paylor, one of the members of the ILA committee and ILA's vice president, BUF 17; RBUF 17, sent an email titled "Puerto Rico Merger." BUF 29; RBUF 29. In it, he stated that Local 1575 wanted to know if ILA is committed to the merger and if the new structure would include its representatives. BUF 30; RBUF 30. Paylor said that he had assured it that it would be part of the merged local, it would have representation, and that ILA is committed to working towards a merger. BUF 31; RBUF 31. He sent notices to the locals and held meetings to explain why ILA wanted the merger. BUF 37; RBUF 37. He also prepared worksheets that showed how Local 1740's structure and compensation would be organized afterwards. BUF 38; RBUF 38. The ILA committee placed former Local 1575 officer, Angel López, in a leadership role in Local 1740's proposed post-merger structure, which was memorialized in the merger agreement.

BUF 39; RBUF 39. Individuals from the locals with the authority to execute the merger agreement on behalf of their respective local signed it, and by its terms, except as otherwise provided in it, it became effective on August 1, 2015. BUF 42; RBUF 42; Docket 128-37, pg. 7. The locals did not send ILA a copy of the agreement for its approval. LUF 174; RLUF 174.

The agreement provided that the locals "shall merge into and become an integral part of Local 1740." BUF 43; RBUF 43. It stated as well that the locals agree that the "approval of this merger will constitute an assignment to Local 1740 of all of the rights, title and interest in and to all of the assets of Locals 1575, 1901, and 1902." BUF 45; RBUF 45. Under the merger agreement, Local 1740 expressly assumed all Local 1575's obligations. BUF 47; RBUF 47; Docket No. 128-37, pg. 4. And the locals would have a merged membership list. LUF 164; RLUF 164. But the locals' fringe benefits funds did not merge as part of the agreement. LUF 259; RLUF 259.

## C.  Post-Merger Agreement

### 1.  *Local 1575*

Following the merger agreement, ILA requested more than once that Local 1575 surrender its charter and transfer its assets to Local 1740. LUF 138; RLUF 138. In September 2015, for example, ILA sent letters to Locals 1575 and 1902 telling them to turn over their assets to Local 1740 and surrender their charters. BUF 51; RBUF 51. But neither the merger agreement nor the letters stated that the merger was contingent on turning over their assets and surrendering their charters. BUF 52; RBUF 52; Docket No. 128-37; Docket No. 128-38; Docket No. 128-40. And the letters made clear that the merger agreement was effective as of August 1, 2015. BUF 53; RBUF 53. In January 2016, Local 1575 received another letter instructing it to transfer all its assets to Local 1740 and surrender its charter. LUF 143; RLUF 143. In this letter, ILA said, "[P]lease be aware that because of the merger of Locals 1902, 1575, and 1740 that occurred on August 1, 2015, Local 1575 has ceased to exist as a local union and has been

incorporated into Local 1740. Therefore, [ILA] has directed all
ILA local unions to discontinue to recognize Local 1575 as a
local union." BUF 61; RBUF 61; Docket No. 128-40.

Paylor also confronted Francisco González, Local
1575's acting president, and asked him to turn over Local
1575's assets and charter. LUF 150; RLUF 150; Docket No. 127-
1, pgs. 99–100. Local 1575 never transferred any assets to Local
1740. LUF 153; RLUF 153. But it had no money to transfer
when it signed the merger agreement. LUF 154; RLUF 154. It
did, however, have a car. LUF 154; RLUF 154; Docket No. 127-
7. Local 1575 never turned over its charter, either. LUF 160;
RLUF 160. ILA could have sought legal action against Local
1575 to enforce the terms of the merger agreement, but it
chose not to. LUF 179; RLUF 179.

As far as ILA is concerned, Local 1575 does not exist.
LUF 232; RLUF 232. It does, however, still manage the
Pension Fund and Royalty Fund.[3] LUF 233; RLUF 233; Docket

3. The Royalty Fund is a fund that was created for Local 1575's members.
LUF 30–31; RLUF 30–31.

No. 127-7, pgs. 36–37. And Mr. González is still the acting president. LUF 234; RLUF 234; Docket No. 127-7, pg. 79.

### 2. *Local 1740*

After the locals signed the merger agreement, Local 1740's president, Carlos Sánchez Ortíz, announced:

> As we worked together with [ILA], we learned how a merger can benefit our locals. We embraced this initiative and we worked together to develop a merger that protects all ILA members . . . . Let me clarify why I now join this merger wholeheartedly and without reservation. . . . I am proud to serve you and look forward to representing all ILA members [in] Puerto Rico. Let us all declare August 1, 2015, as the day of rebirth of a new era for all ILA members in the Port of San Juan.

BUF 49; RBUF 49; Docket No. 128-44. Local 1740 also tried to find work for Local 1575's members based on their seniority. BUF 50; RBUF 50.

Local 1740's finances and membership changed significantly after the locals signed the merger agreement. In 2014, Local 1740 reported $748,873 in net assets, $526,116 in dues received, and 790 total members (590 active members).

BUF 70; RBUF 70. By 2017, these figures had increased: $1,836,703 in net assets, $1,578,144 in dues received, and 1,450 total members (1,200 active members). BUF 71; RBUF 71. And Paylor said that he wanted to keep Local 1740's executive board's salaries around 50% of Local 1740's income. BUF 98; RBUF 98; Docket No. 128-100. On Local 1740's post-merger spreadsheet, its executive board's salaries total $480,000. Because its income in 2013 and 2014 was only about $500,000, the post-merger salaries assumed its income would include the other locals' income. Altogether, the locals' income in 2013 was 1.1 million dollars. BUF 98; RBUF 98; Docket No. 128-101, pg. 3. Local 1575 had the second-highest income at around $300,000. BUF 98; RBUF 98; Docket No. 128-101, pg. 3.

Of the locals who signed the merger agreement, only Locals 1901 (which was litigating its status with ILA) and 1740 negotiated labor terms with the employers in the Port of San Juan. BUF 62; RBUF 62; Docket No. 128-73; Docket No. 128-2, pgs. 27–28, 41. Local 1740 negotiated collective-bargaining agreements that included work areas that had previously

belonged to Local 1575. BUF 63; RBUF 63; Docket No. 128-47, pg. 3. And Local 1740 is the only remaining local that represents ILA members. BUF 68; RBUF 68.

Local 1740's new structure included Mr. López, who had "1575" noted next to his name. BUF 67; RBUF 67; Docket No. 128-30, pg. 3. He was the only Local 1575 officer who became an officer at Local 1740. LUF 273; RLUF. Mr. López determined which members of Local 1575 met Local 1740's seniority requirement, identified the work that they had performed, and filled out their transfer cards. BUF 59; RBUF 59; Docket No. 128-5, pgs. 19–22. About 200 of Local 1575's members transferred to Local 1740. BUF 60; RBUF 60; Docket No. 128-5, pgs. 66–68. So a little less than one-third of Local 1575's members transferred to Local 1740. LUF 111; RLUF 111.

### 3.  *Locals 1901 and 1902*

Local 1740 admits that both Locals 1901 and 1902 merged into it. BUF 58; RBUF 58; Docket No. 128-7, pg. 17. Before it merged with Local 1740, ILA put Local 1901 into a trusteeship because it had refused to go forward with the

merger. LUF 188–89; RLUF 188–89. But Local 1901 ultimately complied with what ILA asked it to do. LUF 192; RLUF 192. It, for example, transferred $225,758 in assets to Local 1740. LUF 193; RLUF 193. But it did not surrender its charter. LUF 194; RLUF 194. Local 1902, however, did surrender its charter. LUF 201–02; RLUF 201–02; Docket No. 127-22, pg. 111. Local 1901 merged with Local 1740 in 2016. LUF 196; RLUF 196. Locals 1740 and 1901 therefore merged more than a year after signing the merger agreement. LUF 197; RLUF 197. But that agreement contains a clause that allowed Local 1740 to exclude Local 1901 from the merged entity if its financial statements were not in order. Docket No. 127-30, pg. 4.

When a local's existence ends through a merger, it is required to file a terminal report with the Office of Labor Management Standards. LUF 184; RLUF 184; 29 C.F.R. § 402.5. Locals 1901 and 1902 filed one. LUF 186–87; RLUF 186–87. Local 1575 did not. LUF 185; RLUF 185.

### D. Pension Fund

The Pension Fund is an employee-benefit plan covered by ERISA and the MPPAA. BUF 1; RBUF 1. It was created through a Trust Agreement and provides its beneficiaries with pension and retirement benefits. BUF 2–3; RBUF 2–3. In January 2015, the fund's contributing employers included Horizon, Local 1575, ILA, and the fund itself. LUF 19; RLUF 19. Horizon was its largest contributor. LUF 20; RLUF 20.

The Pension Fund has two company trustees that are named by the contributing companies and two union trustees that are named by Local 1575 and ILA. LUF 25; RLUF 25. Mr. González is one of the union trustees. LUF 26; RLUF 26. And he is also a trustee of the Royalty Fund. LUF 32; RLUF 32. When Horizon closed its operations at the Port of San Juan, he remained a trustee of both funds. LUF 34; RLUF 34.

One of the Board's fiduciary obligations is to collect liabilities to the Pension Fund, including delinquent contributions and withdrawal liability. BUF 4; RBUF 4. Because Local 1575 participated in the fund, it was required

to contribute to it. BUF 73; RBUF 73. When the locals signed the merger agreement, Local 1575 owed the fund $7,040 in contributions. BUF 74; RBUF 74. When Horizon left the Port of San Juan, it triggered a mass withdrawal from the fund, which, in turn, triggered the contributing employers' withdrawal liability. BUF 76; RBUF 76.

In March 2015, the Pension Fund informed ILA's president and Local 1575 that it had chosen to stop receiving contributions from the participating employers because of Horizon's departure and that it intended to collect withdrawal liability. LUF 56–57; RLUF 56–57. On March 31st, the fund stopped accepting contributions and sent a collection letter to Local 1575. LUF 59–60; RLUF 59–60. Local 1575 responded to that letter, and a few days later, the fund sent it another one explaining that it had to pay the amount owed to the fund plus interest. LUF 61–62; RLUF 61–62. In July 2015, the fund sent Mr. González a letter informing him of its initial withdrawal liability calculation, and in August, it sent him a letter informing him of its final calculation. LUF 63–64; RLUF

63–64. In September, the fund sent Local 1575 a letter requesting its first withdrawal liability payment, which it did not make. LUF 65–66; RLUF 65–66. The fund therefore sent several notices informing Local 1575 of its withdrawal liability. BUF 83; RBUF 83; Docket Nos. 128-81, 128-82.

Before the locals signed the merger agreement, ILA knew that Local 1575 may be subject to withdrawal liability. BUF 77; RBUF 77; Docket No. 130-5. Mr. González communicated with ILA about that liability. BUF 81; RBUF 81; Docket No. 128-1, pgs. 100–102; Docket No. 130-5. And ILA forwarded information about it to its attorneys. BUF 82; RBUF 82. In early 2016, the fund's administrator wrote letters to Mr. Sánchez, informing him that the Board had learned of the merger agreement and demanded that Local 1740, Local 1575's successor, pay Local 1575's delinquent contributions and withdrawal liability. BUF 83; RBUF 83; Docket Nos. 128-87, 128-88. Local 1740 did not dispute the amount of withdrawal liability that the fund's administrator claimed. BUF 86; RBUF 86; Docket No. 147-1, pgs. 13–14.

Before the locals signed the merger agreement, ILA encouraged Local 1575 to have the trustees of its employee-benefit funds assert claims "including but not limited to a claim against [Horizon] for its withdrawal liability owed to the [fund]." BUF 90; RBUF 90; Docket No. 128-89. In August 2015, Paylor stated that Mr. González told him that the fund's trustees expected Local 1740 to cover Local 1575's liability. BUF 91; RBUF 91; Docket No. 128-24, pg. 5. In August 2016, Paylor contacted Mr. Sánchez about the possibility of him using a pension fund lawyer to handle the withdrawal liability issue. BUF 92; RBUF 92; Docket No. 128-90.

At an ILA meeting in July 2016, it discussed how to shield Local 1740 from Local 1575's withdrawal liability. BUF 93; RBUF 93. One of its talking points stated, "The issue[] that [ILA] must resolve is protecting Local 1740 from the complaint of withdrawal liability based on the issue that Local 1575 never complied with the directive. A letter coming from [ILA] stating this is important." BUF 94; RBUF 94. When Paylor was asked how ILA protected Local 1740 from

withdrawal liability, he said that it has not and that, from this
process, he has learned to stop writing memos. He also said
that he generated the memos "knowing that this will probably
take . . . legal action." BUF 95; RBUF 95.

A clause in the merger agreement provided that each
local "as of the date of the execution of this agreement . . . ha[s]
no contractual or contingent liabilities except those reported
to the U.S. Secretary of Labor on the 2014 LM reports." LUF
204; LUF 204. Docket No. 127-30, pg. 3. Mr. González did not
tell Local 1740 about the debts Local 1575 incurred during the
first quarter of 2015. LUF 212; RLUF 212; Docket No. 127-7,
pg. 147. And Local 1575, though it told ILA about its liabilities
to the fund, never told Local 1740. LUF 218; RLUF 218. Mr.
Sánchez was not aware of Local 1575's liabilities to the fund
or that it was a contributing employer. LUF 219; RLUF 219;
Docket No. 127-10, pg. 3. None of the employees for whom
Local 1575 made contributions to the fund went to work for
Local 1740. LUF 236; RLUF 236. Local 1740 does not have the
ability to appoint trustees to the fund, nor does it have

decision-making power concerning it. LUF 255; RLUF 255.

Before the merger, Paylor asked the locals to send him financial reports and documents, including their year-end financial report (LM-2 Report), to help him "proceed[] with the merger." BUF 33; RBUF 33. Local 1575's 2014 LM-2 Report, which is a publicly available document and covered the period from January 1, 2014, to December 31, 2014, Docket No. 127-27, identified it as a contributing employer to the Pension Fund and included the contributions it had paid to it. BUF 34; RBUF 34; *see also* BUF 75; RBUF 75. The report did not reflect any contingent liabilities, LUF 208; RLUF 208, or Pension Fund liabilities, LUF 209; RLUF 209. But recall that the fund did not assess those liabilities until 2015.

## IV. ANALYSIS

ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines*, 463 U.S. 85, 91 (1983). Congress amended it through the MPPAA "to ensure defined pension benefit plans remain viable, dissuade

employers from withdrawing from multiemployer plans, and enable a pension fund to recoup any unfunded liabilities." *Sun Cap. Partners III, LP v. New Eng. Teamsters Indus. Pension Fund*, 943 F.3d 49, 57 (1st Cir. 2019) (citing *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720–22 (1984)). The MPPAA does this by requiring employers that withdraw from funds to pay withdrawal liability or their share of the "unfunded vested benefits." 29 U.S.C. § 1381(a), (b)(1).

The Board asserts two claims against Local 1740: (1) a delinquent contribution claim under ERISA, 29 U.S.C. § 1145, and (2) a withdrawal liability claim under the MPPAA, 29 U.S.C. § 1381. Section 1145 provides that every employer obligated to contribute to a "multiemployer plan under the terms of the plan . . . shall . . . make such contributions in accordance with the terms and conditions of such plan." A trustee of the plan, such as the Board, may bring an action in federal court to enforce this obligation. *Id.* § 1132(a). To prevail on its delinquent contribution claim, the Board must prove that: (1) the Pension Fund is a multiemployer plan

under ERISA, (2) Local 1575 is an employer obligated to make contributions to the plan, and (3) Local 1575 failed to make those contributions. *Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021). And to prevail on its MPPAA claim, it must prove that: (1) the Pension Fund is a multiemployer plan under ERISA, and (2) Local 1575 is an employer that has withdrawn from the plan. *See UFCW Loc. One Pension Fund v. Enivel Props. LLC*, 791 F.3d 369, 372 (2d Cir. 2015). The added wrinkle in this case is that the Board must also prove that Local 1740 is liable for Local 1575's obligations to the fund. Since both claims require the Board to prove that the fund is a multiemployer plan under ERISA and that Local 1575 is an employer, we begin there.

A multiemployer plan is a plan that more than one employer is required to contribute to and "is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer." 29 U.S.C. § 1002(37)(A). The parties agree that

the Pension Fund fits this definition and is therefore covered by ERISA and the MPPAA. And we decided earlier that Local 1575 is an employer under both ERISA and the MPPAA. Docket No. 69, pgs. 16–29.[4] Moreover, the parties agree that Local 1575 has failed to pay its delinquent contributions and has withdrawn from the fund. So the only remaining issue is whether Local 1740 is obligated to pay Local 1575's delinquent contributions and withdrawal liability.

The Board seeks summary judgment on the ground that when Local 1740 merged with Local 1575, it assumed its

---

4. The Court assumes that the parties are familiar with our earlier opinion and order. We nonetheless quickly summarize why Local 1575 is an employer under ERISA and the MPPAA. ERISA defines an employer as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." 29 U.S.C. § 1002(5). Proving an obligation to contribute is key to satisfying this definition. Though the MPPAA does not define employer, many circuits define it as "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *See, e.g., Korea Shipping Corp. v. N.Y. Shipping Ass'n–Int'l Longshoremen's Ass'n Pension Tr. Fund*, 880 F.2d 1531, 1537 (2d Cir. 1989). The Board proved that Local 1575 is an employer under both ERISA and the MPPAA by demonstrating its obligation to contribute to the Pension Fund through records of, among other things, its prior contributions. And the parties agree here that Local 1575 is obligated to contribute to the fund.

liabilities, including its obligation to pay delinquent contributions and withdrawal liability. And even if they did not merge, the Board contends that Local 1740 is obligated to pay Local 1575's delinquent contributions and withdrawal liability under the alter-ego doctrine. Local 1740 counters that it instead is entitled to summary judgment because there were conditions precedent that had to occur before it merged with Local 1575, which Local 1575 never completed. So, its argument goes, there has been no merger and thus it is not obligated to pay Local 1575's liabilities. It argues as well that it cannot be liable for Local 1575's obligations to the fund because it is not an employer under ERISA or the MPPAA.

## A. Merger

The crux of the parties' dispute is whether conditions precedent[5] exist in the merger agreement. The Board argues

---

5. A condition precedent, or suspensive condition under Puerto Rico law, is something that must occur before the obligations in a contract take effect. *Martínez v. Jiménez Realty*, 98 D.P.R. 892, 897 (P.R. 1970). So though the parties have consented to the obligations, they have also added a self-imposed limitation on those obligations in the sense that they will not have to fulfill them unless and until the condition precedent occurs. *See id.*

that there are no conditions precedent and, by the merger agreement's terms, the agreement became effective on August 1, 2015. Docket No. 122, pgs. 14, 19–20. Local 1740 contends that the merger would not occur until Local 1575 turned over its assets and surrendered its charter, the locals merged their membership lists, and ILA approved the merger. Docket No. 126, pgs. 21–22. Because Local 1575 never did those things, it says, no merger occurred.

The parties agree that Puerto Rico law governs our interpretation of the merger agreement. Docket No. 122, pg. 17 n.7; Docket No. 141, pgs. 4–5. The Puerto Rico Civil Code states, "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." P.R. LAWS ANN. tit. 31, § 3471 (repealed by Law of June 1, 2020, and replaced with P.R. LAWS ANN. tit. 31, § 6342(b)). It states as well that courts must ascertain the "intention of the contracting parties" from

"their acts, contemporaneous and subsequent to the contract." *Id.* § 3472 (repealed by Law of June 1, 2020, and replaced with § 6342(b)).[6] Construing these provisions and Puerto Rico's former parol evidence rule,[7] the First Circuit has said that "courts may not 'consider[] . . . extrinsic evidence to vary the express, clear, and unambiguous terms of a

---

6. Section 6342(b)'s language is substantially similar to the language from sections 3471 and 3472. But section 6342(b) allows courts to also consider parties' conduct prior to the contract to determine their intent. We are not aware of any caselaw construing section 6342(b) differently from sections 3471 and 3472. And sections 3471 and 3472 were the ones in effect when the parties signed the merger agreement.

7. That Puerto Rico's parol evidence rule has been repealed does not impact the First Circuit caselaw that we cite in our analysis. This caselaw "d[oes] not rely exclusively on the parol evidence rule." *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 448 n.9 (1st Cir. 2010). Instead, these "decisions make clear that [the Puerto Rico Civil Code provisions] preclude[] consideration of 'extrinsic evidence to vary the express, clear, and unambiguous terms of a contract.'" *Id.* (quoting *Borschow Hosp. & Med. Supplies, Inc. v. César Castillo Inc.*, 96 F.3d 10, 15 (1st Cir. 1996)); *see also Vulcan Tools v. Makita USA*, 23 F.3d 564, 567 (1st Cir. 1994) (stating the principles of Puerto Rico's parol evidence rule are embedded in its Civil Code); *P.R. Tel. Co. v. Advanced Cellular Sys., Inc.*, 483 F.3d 7, 12 (1st Cir. 2007) (explaining, without relying on Puerto Rico's parol evidence rule, that as a consequence of Puerto Rico's Civil Code provisions, "a court may not consider extrinsic evidence at all, if it finds that the terms of an agreement are clear").

contract.'" *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 447 (1st Cir. 2010) (quoting *Borschow Hosp. & Med. Supplies, Inc. v. César Castillo Inc.*, 96 F.3d 10, 15 (1st Cir. 1996)); *see also P.R. Tel. Co. v. Advanced Cellular Sys., Inc.*, 483 F.3d 7, 12 (1st Cir. 2007) (stating no extrinsic evidence of the parties' intent is allowed "if the terms of an agreement are clear"). The terms of an agreement are clear when they are "sufficiently lucid to be understood to have one particular meaning, without room for doubt." *Vulcan Tools v. Makita USA*, 23 F.3d 564, 567 (1st Cir. 1994) (quoting *Hopgood v. Merrill Lynch, Pierce, Fenner & Smith*, 839 F. Supp. 98, 104 (D.P.R. 1993)). So we begin with the terms of the merger agreement. For unless those are unclear, we cannot consider any extrinsic evidence of the parties' intent. *Borschow Hosp. & Med. Supplies*, 96 F.3d 10 at 16 ("Yet to consider extrinsic evidence at all, the court must first find the relevant terms of the agreement unclear. That requirement not being met, the district court correctly went no further." (quoting *Exec. Leasing Corp. v. Banco Popular de P.R.*, 48 F.3d 66, 69 (1st Cir. 1995))).

The Board says that there are no conditions precedent in the merger agreement. Docket No. 122, pgs. 16–17. Local 1740 disagrees. Docket No. 126, pg. 19. It says that several conditions[8] needed to be fulfilled before the merger would occur: Local 1575 had to turn over its assets, surrender its charter, provide Local 1740 its membership list, and ILA had to approve the merger. *Id.* at 19–21. First, Local 1740 says that page three, paragraph four of the merger agreement contains a condition precedent that Local 1575 turn over its assets to Local 1740. *Id.* at 19 (citing LUF 136 which, in turn, cites "Merger Agreement at page 3, ¶ 4"). That paragraph states, as relevant:

> Locals 1575, 1740, 1901, and 1902 agree that approval of this merger will constitute an assignment to Local 1740 of all of the rights, title and interest in and to all of the assets

8. Local 1740 mentions, in passing, one additional condition precedent, which is that ILA must amend Local 1740's charter to incorporate Local 1575's jurisdiction. Docket No. 126, at pgs. 5, 31. But it never develops this argument. So we disregard it. *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed."). In any event, there is no such condition in the contract.

> of Locals 1575, 1901, and 1902, including but not limited to accounts receivable and union monetary obligations due from members. Local 1740 shall assume all obligations of Locals 1575 and 1902 and the parties agree to execute such instruments . . . to effectuate the foregoing.

Docket No. 127-30, pg. 3. But there is no language conditioning the merger on Local 1575 turning over its assets to Local 1740. Instead, the agreement provides that approval of the merger constitutes an assignment of the other locals' assets to Local 1740. To be sure, Local 1575 is contractually obligated to execute the instruments necessary to effectuate this assignment, but that Local 1575 did not turn over its assets does not mean that the merger did not occur. It means that Local 1740 could seek legal recourse to force Local 1575 to turn over its assets.

Second, Local 1740 contends that the merger agreement "required that, prior to the merger being final and completed, Locals 1575, 1901, and 1902 would have to surrender their charters" to ILA. Docket No. 126, pg. 20 (citing LUF 159 which, in turn, cites "Merger Agreement at page 4,

¶ 5"). The relevant language is as follows:

> Locals 1575, 1740, 1901, and 1902 jointly shall . . . request
> that [ILA] amend the charter granted to Local 1740 to
> include the jurisdictions formerly possessed by Locals
> 1575, 1901, and 1902 as a consequence of the charters
> granted to them by [ILA]. Locals 1575, 1901, and 1902 shall
> surrender their charters to [ILA] if so required by [ILA].

Docket No. 127-30, pg. 4. Nothing in this provision conditions
the merger on the locals surrendering their charters to ILA. It
simply requires that they surrender their charters if asked.
Refusing to surrender it may leave Local 1575 open to a
breach-of-contract claim, but it would not block the merger.

Third, Local 1740 argues that the merger was
contingent on the locals providing it with their membership
lists. Docket No. 126, pg. 20 (citing LUF 164 which, in turn,
cites "Merger Agreement at pages 4–6, ¶¶ 6–8, 11"). But none
of the provisions it cites supports its argument. Those
provisions state that members in good standing under the
other locals will be members in good standing under Local
1740, Docket No. 127-30, pg. 4, that the term "good standing"

in Local 1740's bylaws will include the "good standing" status of other locals' members prior to the merger, *id.* at 5, and that the locals agree to enforce the work-sharing agreement, *id.*

Fourth, Local 1740 states that the merger was contingent on ILA approving it "by means" of the locals submitting the agreement to it. Docket No. 126, pg. 21 (citing LUF 173 which, in turn, cites "Merger Agreement at page 4–5, ¶¶ 5, 7, 9"). The agreement states, "Simultaneously with the execution of this merger agreement, [the locals] shall send to [ILA] a copy of this agreement and request that [ILA] amend the charter granted to Local 1740 to include the [other locals'] jurisdictions." Docket No. 127-30, pg. 4. And other provisions condition their effect on approval of the merger. *Id.* at 3 (agreeing "approval of this merger will constitute an assignment"); *id.* at 5 ("Upon approval of the merger in the manner provided in this agreement, dues obligations of former members of Locals 1575, 1740, 1901 and 1902 shall . . . be payable to Local 1740."); *id.* ("The monetary obligations of members of Locals 1575, 1740, 1901 and 1902 to their

respective local unions shall be deemed, if unpaid, monetary obligations owed to Local 1740 upon approval of the within merger . . . . "). But the agreement never states whose approval is required nor that sending it to ILA is the "manner of approval." Since the agreement speaks of approval but never specifies whose is required nor what that approval entails, the agreement is *not clear* as to whether the merger was contingent on ILA's approval by means of the locals submitting a signed copy of the agreement to it. *See Exec. Leasing Corp.*, 48 F.3d at 69 (stating "[u]nder Puerto Rico law, an agreement is 'clear' when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation'" (quoting *Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir. 1987))). Thus, we turn to extrinsic evidence to ascertain the parties' intent. *See Borschow Hosp. & Med. Supplies*, 96 F.3d 10 at 16.

It is undisputed that the locals did not send the merger agreement to ILA for approval and that Locals 1901 and 1902 merged with Local 1740. Since two of the locals merged into

Local 1740 notwithstanding the fact that the locals never sent the merger agreement to ILA for its approval, the locals' subsequent conduct makes clear that they did not intend sending the signed agreement to ILA for its approval to be a condition precedent to the merger. Local 1740's evidence to the contrary is of no help to them. Local 1740 relies on Paylor's and Sánchez's statements that the merger agreement required ILA to approve the merger by means of the locals submitting the signed agreement to it. Docket No. 127-2, pg. 5 ("The Merger Agreement . . . required that the merger had to be approved by . . . ILA by means of submitting the signed agreement to . . . ILA for approval and by requesting a revised and updated charter . . . for the new merged local."); Docket No. 127-4, pg. 5 (same). But as we explained, the agreement does not clearly say that.

The Board has shown that it is entitled to judgment as a matter of law. Contract interpretation is a pure question of law, at least when we do not resort to extrinsic evidence. *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 97 (1st Cir. 2011); *see*

*also Trout v. Organización Mundial de Boxeo*, 965 F.3d 71, 75, 82 n.9 (1st Cir. 2020) (stating, in a case where Puerto Rico law controlled a regulation's interpretation, that the parties agreed that contract interpretation is a question of law). If the contract's dispositive language is clear, we "may proceed to construe the language and dispose of the summary judgment motion accordingly." *Mason v. Telefunken Semiconductors Am.*, 797 F.3d 33, 38 (1st Cir. 2015). But if it is ambiguous and we resort to extrinsic evidence, we "ask whether the extrinsic evidence reveals a genuine issue of material fact regarding the meaning of the ambiguous language." *Id.* The ambiguity will not preclude summary judgment where "the extrinsic evidence is 'so one-sided that no reasonable person could decide the contrary.'" *Id.*

Applying these principles, there is no trialworthy issue here. The merger agreement is clear that there is no condition precedent that Local 1575 turn over its assets, surrender its charter, or provide Local 1740 its membership list. To be sure, the agreement is ambiguous as to whether there is a condition

precedent that ILA approve the merger in a specific manner. But that Locals 1901, 1902, and 1740 merged notwithstanding the fact that ILA never approved the merger in that manner is so one-sided that no reasonable juror could find that the parties intended ILA's approval to be a condition precedent. After all, Local 1740 presented no extrinsic evidence on this issue because its only support is two people's statements explaining what they believe the contract itself required rather than conduct demonstrating the parties' intent. Because the extrinsic evidence is one-sided, the ambiguity as to whether the merger was contingent on ILA's approval in a specific manner will not block summary judgment.

Thus, Local 1575 merged into Local 1740 on August 1, 2015. [9] *See* Docket No. 127-30, pg. 2 ("Locals 1575, 1740, 1901 and 1902 shall merge into and become an integral part of

---

9. The parties agree that Local 1901 did not merge into Local 1740 until 2016. But the merger agreement contains a provision that allows Local 1740 to exclude Local 1901 from the merged entity if it "later determines that Local 1901's financial statements are not in order." Docket No. 127-30, pg. 4.

Local 1740 . . . ."); *id.* at 6 ("This merger agreement and all its provisions, except as otherwise provided herein, will become effective on August 1, 2015."). As part of the merger, Local 1740 "assume[d] all obligations of Local[] 1575." *Id.* at 3. Local 1740's only defense against liability is that it did not merge with Local 1575. Docket No. 126, pg. 29 ("For the same reasons that Local 1740 is not liable for Local 1575's withdrawal liability, Local 1740 is not liable for Local 1575's delinquent contributions, if any: Local 1575 and Local 1740 never merged."). Even its argument that it is not an employer is contingent on there being no merger. *Id.* at 27 ("Simply put: Local 1575 and Local 1740 never merged. Thus, Local 1740 is not an 'employer' with regards to the Pension Fund . . . .").

Local 1740 assumed Local 1575's liabilities when it merged with it, so Local 1740 must pay its delinquent contributions and withdrawal liability. Eight circuits agree that an employer under both ERISA and the MPPAA is an entity "obligat[ed] to pay into a pension, either as a direct employer or on behalf of one." *J. Supor & Son Trucking &*

*Rigging Co. v. Trucking Emps. of. N. Jersey Welfare Fund*, 30 F.4th 179, 181–82 (3d Cir. 2022) (collecting cases). Because Local 1740 expressly assumed Local 1575's obligations in the merger agreement, it is acting in the interest of Local 1575—a direct employer. *See Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 855 (1st Cir. 1993) (explaining that if an entity "assumes a liability that would otherwise be borne by the employer," it is behaving in the interest of the employer and thus is an employer under ERISA); *see generally Silverman v. Teamsters Loc. 210 Affiliated Health & Ins. Fund*, 761 F.3d 277, 285 (2d Cir. 2014) ("A person who acts in an employer's interest is one who . . . explicitly assumes the employer's obligations.").

It does not matter that Local 1740 claims that it was not aware of Local 1575's obligation to contribute to the Pension Fund and its withdrawal liability.[10] When resolving "issues

---

10. Local 1740 also says that Local 1575 "made false representations" in the merger agreement by stating that it had no liabilities except those in its 2014 LM-2 Report. Docket No. 126, pgs. 22–23. But Local 1740 does not develop this assertion by, for example, arguing that this allegedly false representation is a ground for invalidating or rescinding the merger agreement. Since Local 1740 never develops this assertion into an

involving rights and obligations under private welfare and pension plans," like we are doing here, Congress intended that we apply federal substantive law. *Sun Cap. Partners III*, 943 F.3d at 57 ("Congress 'intended that a body of Federal substantive law [would] be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans.'" (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 156 (1985))). It is "almost universally" accepted "that when two corporations merge, the surviving corporation assumes the liabilities of the extinct corporation." *Teamsters Pension Tr. Fund v. Littlejohn*, 155 F.3d 206, 209 (3d Cir. 1998). And generally, "there is no requirement that the surviving entity have pre-merger notice of the predecessor's debts." *Id.* at 210. We adopt this rule here. ERISA and the MPPAA are designed to protect pension-plan participants. We agree with the Third Circuit in *Littlejohn* that allowing a surviving entity to escape the pension-plan debt of the extinct

---

argument, we disregard it. *Cf. Higgins*, 194 F.3d at 260 ("The district court is free to disregard arguments that are not adequately developed.").

one simply because it did not do its due diligence to discover the debt's existence would create a perverse incentive for both the successor and the extinct entity: The survivor could escape liability by "hid[ing] its head in the sand" and failing to review records, and the extinct entity could unilaterally extinguish its debt by hiding it from the survivor. *Id.*

These concerns are heightened here because all the locals are ILA entities, ILA owns all their assets, and ILA knew about Local 1575's liabilities before the merger. The record before us is troubling, to say the least. It appears that Local 1740 and ILA are trying to escape Local 1575's liabilities—which ILA knew about—while Local 1740 pockets dues from Local 1575's former members and negotiates work agreements that include its former territory. *Littlejohn*'s rule, which we adopt, prevents this unpalatable result. Notice or not, Local 1740 is liable for Local 1575's obligations, which it expressly assumed through the merger.

Finally, Local 1740 tries to escape liability on the ground that the locals' fringe benefit funds did not merge as

part of the merger agreement. Docket No. 126, pg. 26. To be sure, they are correct that the locals' fringe benefit funds did not merge. The merger agreement states,

> The parties agree that any labor-management trust agreements to which Locals 1575, 1740, 1901, and 1902 are parties to provide fringe benefits, including welfare, pension, and vacation benefits shall remain unaltered and shall survive the merger. The merged Local 1740 may negotiate new agreements in the future to provide benefits for the membership of the merged local union if it decides to do so.

Docket No. 127-30, pg. 5. But this provision has nothing to do with whether Local 1740 assumed the other locals' liabilities to those funds. This provision simply provides that the locals' agreements with those funds would survive the merger and that Local 1740 could negotiate new agreements in the future. So it does not shield Local 1740 from liability. To the contrary, because the merger agreement provides that all the locals would merge into Local 1740 and that their agreements with benefit funds would survive, the merger agreement contemplates that Local 1740 would stand in those locals' shoes with respect to those agreements.

To sum up, the Board has shown that, based on the undisputed facts, it is entitled to judgment as a matter of law. There are no conditions precedent to the merger. The merger, by its own terms, became effective on August 1, 2015. To the extent that Local 1575 failed to comply with some of its obligations in the merger agreement, it may be subject to a breach-of-contract claim. Local 1740 has advanced no argument as to why the contract should instead be invalidated or rescinded because of Local 1575's possible breaches. Through the merger, Local 1740 expressly assumed Local 1575's obligations to the fund and it is therefore acting in its interest with respect to the fund. Thus, Local 1740 is an employer under ERISA and the MPPAA and it is obligated to pay Local 1575's delinquent contributions and withdrawal liability.

## B. Alter-Ego Doctrine

Even if Locals 1575 and 1740 had not merged, Local 1740 would be liable for Local 1575's Pension Fund obligations under the alter-ego doctrine. The Board contends

that Local 1740 is liable as Local 1575's alter ego because, after they signed the merger agreement, it stepped into Local 1575's shoes. Docket No. 122, pg. 3. The alter-ego doctrine is an equitable tool to hold a successor liable for the debts of the predecessor where the one is merely a disguised continuance of the other. *Groden v. N&D Transp. Co.*, 866 F.3d 22, 27 (1st Cir. 2017); *see also Mass. Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors*, 343 F.3d 18, 21–22 (1st Cir. 2003) (stating the alter-ego doctrine "is a tool to be employed when the corporate shield, if respected, would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield"). It can also be used in situations where the companies at issue are parallel rather than successive. *Groden*, 866 F.3d at 27. Relying on the alter-ego doctrine in ERISA and MPPAA cases "prevent[s] the evasion of pension obligations, thereby protecting employee benefits and denying employers 'an unearned advantage in [their] labor activities.'" *Id.* at 27 & n.11 (quoting *Mass. Carpenters Cent. Collection Agency v.*

*Belmont Concrete Corp.*, 139 F.3d 304, 308 (1st Cir. 1998)); *see also Belmont Concrete Corp.*, 139 F.3d at 308 ("[U]nderlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits." (quoting *Chi. Dist. Council of Carpenters Pension Fund v. P.M.Q.T., Inc.*, 169 F.R.D. 336, 342 (N.D. Ill. 1996))).

If Local 1740 is the alter ego of Local 1575, then it is legally equivalent to it and is therefore liable for its obligations to the Pension Fund. *Cf. Groden*, 866 F.3d at 28 ("[I]n our circuit . . . a plaintiff may seek to impose ERISA liability on an alter ego of the employer that formally bears the obligations imposed by the statute."). We weigh a number of factors to decide whether Local 1740 is Local 1575's alter ego: "continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus." *Id.* at 27 (quoting *Belmont Concrete Corp.*, 139 F.3d at 308). None of these factors is controlling, and all need

not be present. *Id.* at 28. Alter-ego analyses "are largely fact-driven, and general statements of doctrine go only so far." *Langone v. William Walsh, Inc.*, 101 F.3d 106 tbl., No. 96-1105, 1996 WL 672277, at * 1 (1st Cir. Nov. 20, 1996) (unpublished).

Continuity of ownership, "perhaps the most important predicate," *NLRB v. Hosp. San Rafael*, 42 F.3d 45, 51 (1st Cir. 1994), exists here. It is undisputed that ILA owns both Local 1575's and Local 1740's assets. *Cf. id.* (finding continuity of ownership where the same individuals owned 87% of the predecessor's stock and 60% of the successor's stock). As to management similarity, ILA placed Local 1575 officer Angel López in a leadership role in Local 1740's post-merger structure. And ILA supervises both locals in the sense that it is their highest governing body and has the power to merge them and amend their charters. Both locals have an identical business purpose: to represent ILA members in the Port of San Juan. And Local 1740 is the only local that still represents ILA members there. Their membership base is also similar. Around one-third of Local 1575's members transferred to

Local 1740 after the merger agreement. Moreover, they have identical geographic locations in that they both operate in the Port of San Juan and after the locals signed the merger agreement, Local 1740 negotiated collective-bargaining agreements that included work areas that had belonged to Local 1575.

Taken together, these undisputed facts render Local 1740 the alter ego of Local 1575. Holding otherwise would allow Local 1740 to pocket the dues from Local 1575's former members and negotiate work agreements involving its former territory while escaping its liabilities to the Pension Fund. And it would also allow ILA—the owner of the locals' assets—to escape Pension Fund obligations by leaving them in a defunct local. In short, refusing to treat Local 1740 as Local 1575's alter ego would work the inequity of denying people their Pension Fund benefits while allowing sister unions to evade pension liabilities by shifting membership and operations to one while leaving the other a defunct debt shell. The alter-ego doctrine prevents that inequity. Because

Local 1740 is Local 1575's alter ego, it stands in its shoes with respect to its Pension Fund obligations. Had we not decided that the Board is entitled to summary judgment because Locals 1575 and 1740 merged and Local 1740, as Local 1575's successor, has assumed its liabilities, we would grant the Board summary judgment on the ground that Local 1740 is liable for Local 1575's obligations as its alter ego.

## V. ARBITRATION

The Board argues that Local 1740 has waived its ability to contest the amount of withdrawal liability it owes to the Pension Fund because it failed to timely initiate arbitration. Docket No. 122, pg. 23. Local 1740 counters that it has not failed to timely initiate arbitration because it is defending itself from liability on the ground that it is not an employer, which is a question for the court to resolve—not an arbitrator. Docket No. 126, pgs. 14–15 & n.2–3. So, its argument goes, if we decide that it is an employer, it will then be subject to the MPPAA's arbitration scheme and can contest the amount of withdrawal liability. We agree with the Board that Local 1740

has waived its ability to contest the amount of withdrawal liability by not timely initiating arbitration.

Recall that an employer that withdraws from a multiemployer pension plan is "liable for its proportionate share of the plan's unfunded vested benefits." *Giroux Brothers Transp. v. New Eng. Teamsters & Trucking Indus. Pension Fund*, 73 F.3d 1, 3 (1st Cir. 1996). "As soon as practicable" after an employer's withdrawal, the plan must notify the employer of the liability amount and demand payment. *Id.* (quoting 29 U.S.C. § 1399(b)(1)). Within 90 days of receiving such notice, the employer may ask the plan to review, among other things, its withdrawal liability calculation. *Id.* § 1399(b)(2)(A). And after a reasonable review, the plan must inform the employer of its decision. *Id.* § 1399(b)(2)(B).

Any dispute about the plan's withdrawal liability calculation is subject to arbitration. 29 U.S.C. § 1401(a)(1). Either party may initiate arbitration within 60 days of the earlier of two events: (1) the date the plan notified the employer of its withdrawal liability or (2) 120 days after the

employer requests a review from the plan. *Id.* § 1401(a)(1)(A)–
(B). If no one initiates arbitration, the amount of withdrawal
liability that the plan claims "shall be due and owing." *Id.*
§ 1401(b)(1).

That Local 1740 wanted to contest whether it is an
employer under ERISA and the MPPAA is no excuse for
failing to initiate arbitration to contest the withdrawal liability
amount. The consequence of failing to arbitrate is extremely
harsh: It is well-settled that an employer waives its ability to
contest the withdrawal liability amount if it fails to timely
initiate arbitration. *See, e.g., Trs. of the Suburban Teamsters of N.
Ill. Pension Fund v. E Co.*, 914 F.3d 1037, 1039 (7th Cir. 2019);
*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. BES
Servs.*, 469 F.3d 369, 376 (4th Cir. 2006); *Connors v. Incoal, Inc.*,
995 F.2d 245, 249 n.6 (D.C. Cir. 1993); *Trs. of Colo. Pipe Indus.
Pension Tr. v. Howard Elec. & Mech. Inc.*, 909 F.2d 1379, 1386
(10th Cir. 1990). The result is no different when the entity
defends itself in court on the ground that it is not an employer.
To be sure, whether Local 1740 has ever been obligated to

contribute to the Pension Fund is a question that requires judicial resolution. *See, e.g., N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs.*, 426 F.3d 640, 645–47 (2d Cir. 2005); *Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 141–42 (3d Cir. 1997); *Banner Indus., Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 875 F.2d 1285, 1291 (7th Cir. 1989). But an entity that argues that it is not an employer because it has never been obligated to contribute to a fund must do something to "preserve review and arbitration" if it also wishes to contest the withdrawal liability amount. *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 129 (3d Cir. 1986). If an entity believes that it is not an employer because it has never been obligated to contribute, it should bring a declaratory action to have the court resolve that question and ask the court to "enjoin the running of the statutory period for seeking review and arbitration." *Id.*; *see also ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 887 (2d Cir. 1988) ("If a party wishes to seek judicial resolution of its dispute without first submitting to arbitration it should seek

declaratory and/or injunctive relief against the imposition of withdrawal liability before the time period to initiate arbitration expires."); *I.A.M. Nat'l Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 429 (D.C. Cir. 1987) ("[T]he defenses [the employers] sought to raise in the Fund's collection actions [are] issues that should have been submitted to arbitration. Having failed to initiate arbitration, these employers were barred from raising their defenses in collection actions brought by the Fund."). If the entity does nothing, like Local 1740 did, it gambles that the court will hold that it is an employer and will have waived the defenses it could have raised in arbitration. This is harsh, but it is "a self-inflicted wound." *Barker & Williamson*, 788 F.2d at 129.

It is undisputed that the Board sent withdrawal liability notices to Local 1575 in 2015 and, after it learned about the merger, to Local 1740 in 2016. So Local 1740's time to initiate arbitration has long expired. Local 1740 argues that the Board failed to give notice and demand payment from it "until more than a year after the withdrawal occurred,"

which, it says, violates § 1399's requirement that the plan give notice "as soon as practicable." Docket No. 126, pg. 14 n.2. But "any dispute regarding the timeliness of the [plan]'s demand under § 1399(b)(1) is statutorily committed to arbitration in the first instance." *Giroux Brothers Transp.*, 73 F.3d at 4. Because Local 1740 failed to contest the timeliness of the Board's notice in arbitration, it has waived that defense. Arbitration is no longer available to Local 1740, and it has waived any defenses that it could have raised there.

## VI. DAMAGES

A court may award damages at summary judgment if they can be calculated from the undisputed facts. *See Brown v. Colegio de Abogados de P.R.*, 613 F.3d 44, 51 n.6 (1st Cir. 2010) ("That damages were awarded on summary judgment adds the further requirement that the district court not resolve fairly disputable factual issues against the non-moving party."). As to the Board's delinquent contribution claim, we award them: "the unpaid contributions," "interest on the unpaid contributions," liquidated damages in an amount

equal to the "interest on the unpaid contributions" or up to 20 percent of the unpaid contributions, and reasonable attorney's fees and costs. 29 U.S.C. § 1132(g)(2). These awards are mandatory. *Laborers Health & Welfare Tr. Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 547 (1988). And as to the Board's withdrawal liability claim, "any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution." 29 U.S.C. § 1451(b). So the Board's award for both its delinquent contribution and withdrawal liability claims are governed by § 1132(g)(2). *Lads Trucking Co. v. Bd. of Trs.*, 777 F.2d 1371, 1374 (9th Cir. 1985); *Penn Elastic Co. v. United Retail & Wholesale Emps. Union, Loc. 115 Joint Pension Fund*, 792 F.2d 45, 47–48 (3d Cir. 1986); *cf. Robbins v. B&B Lines, Inc.*, 830 F.2d 648, 649–50 (7th Cir. 1987).

The parties have not briefed damages in enough detail for us to award them now. Moving forward, the Court will award damages and address all issues related to them in one opinion and order. The Court therefore **ORDERS** the Board

to submit a memorandum—which shall include supporting exhibits—explaining with specific figures the damages that it is entitled to. This memorandum shall be limited to damages and shall not exceed **ten (10) pages**. The Board shall file its memorandum by **June 27, 2022.** Local 1740 shall respond to it by **July 11, 2022.** Its response shall be limited to damages and shall not exceed **ten (10) pages**.

### VII.   CONCLUSION

In sum, because Local 1575 merged into Local 1740—and if it did not, Local 1740 is Local 1575's alter ego—Local 1740 is liable for Local 1575's delinquent contributions and withdrawal liability. The Court therefore **GRANTS** the Board's motion for summary judgment (Docket No. 122) and **DENIES** Local 1740's motion for summary judgment (Docket No. 126).

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 13th day of June 2022.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE